Thank you, Your Honor. It's good morning, almost good afternoon. May it please the Court. I think the first thing the Court would want to know is what is the impact of the only similar precedent in this Court. Before you get to that, could you just walk through why the case isn't moot? Now I've received your submission, but I freely concede I don't, am no expert on how you read military orders. So why is it that his orders keep a live controversy? Okay. Well, I'm glad the Court has reviewed the papers, and I'm actually very impressed at how much the Court has prepared for all of the cases today. Both of the orders that were attached to the submissions regarding the suggestion for mootness had the same ETS date, that's the termination of the enlistment, as December 24, 2031. And I think it was clear in both of the orders that the change in the order was only a temporary reassignment for medical evaluation, and that's been going on since the end of December last year. It still is? Yes. And the government says it will be another three or four months for the medical evaluation. The Court is curious. Doe has a condition called spondylolisthesis, which essentially is a slipped disc in the base of the spine in the lumbar area, and so he was sent back for medical evaluation. And we don't really know when it's going to be completed, but the January 31, 2005 order, which is the most recent one, says very clearly that at the end of the temporary reassignment, that he rejoins his unit on active duty, and he's still subject to stop loss. So it's very clear to me that the case is not currently moot. Of course, some months from now, if he's found medically unfit and he's discharged on that ground, then it would become moot. So I don't know if the Court prefers – of course, it wouldn't be unreasonable to wait before ruling on this case, but I think it's very clear that he's still under stop loss and that the case is not currently moot. And by the way, I'm Michael Sorgan, and with me at counsel's table is Josh Sondheimer, my associate, and we've been representing John Doe. We filed an amicus brief in the Santiago case, and the Court expressly declined to rule on the issues that we raised in the amicus brief because those issues had not been raised by the parties. So to that extent, at least, the Santiago decision does not bind this Court. But I believe that the Santiago decision, even on the issues that it resolved, the contract and due process notice issues, that it should not be binding on this panel because the circumstances are quite different. You've just lost me on that one. Tell me why it is that the circumstances are different. I understand there's a different person involved, but there has to be substantial factual dissimilarities before we would say that Santiago doesn't apply. Tell me why that is. I've missed something. Okay. I'd be pleased to, Your Honor. Santiago was nearing the end of an eight-year enlistment when he was subject, when his unit was alerted, and then he was subjected to the involuntary extension of his enlistment that the military called stop-loss. Doe had already completed an eight-year enlistment, including four years on active duty and service in Iraq and in Somalia. And then he reenlisted after a hiatus period deliberately in the National Guard under a program that was billed as Try One. And there's a finding in the district court that he has two young children and that this was an opportunity to try one-year affiliation with the military to see if he would be interested in maintaining further affiliations. So that's why I call it a try. Well, the factual context is different, but if I understood the record correctly, the contract he entered into with the government is the same contract. It appears so. I haven't seen the contract in the record. Well, let's just assume that it is the same contract. Isn't he going to be bound by the contractual interpretation of Santiago as to what that contract says and whether or not there's a due process violation? I think the difference is significant because the Try One concept. Was that in the contract, Try One? Actually, it is, Your Honor. In the record, it's actually handwritten next to the signature. Yeah. But it's sort of a marketing characterization, isn't it? Well, that's how John Doe was lured in by the notion that he was enlisting in the National Guard for one year. And he re-upped, yes. He re- He re-upped for one year. One year, yes. And that's why that the most significant term in the contract, the one that isn't really discussed in Santiago, is the one that talks about the circumstances under which the enlistment may be extended. I'm not sure where we're going on this. Are you suggesting there's some sort of government estoppel, estoppel of the government by saying Try One, that they can only – that that somehow prevents the government from enforcing the terms of the contract? Is that what I'm saying? You said lured in, and so that's why I wondered. Yes. Okay. Well, and we did refer to it in the brief as a bait and switch. The reason I think it's significant is because it affects the interpretation of the contract. And the specific term in the contract regarding involuntary extension of Doe's enlistment is the most important term in the contract, and it very specifically says that it may occur in the event that Congress declares a war or national emergency, which That's on the State Guard, but he's in the National Guard, and it's a little different. I believe, Your Honor, with all due respect, that the argument about the dual enlistment being State and Federal really relates to the section 12407, which expressly says that no member of the National Guard may be kept in the Federal service beyond the term of his enlistment. But with regard to the involuntary extension of Doe's contract, the contract is very specific, and it says that that may occur. That's in section 10b of the contract, and it appears on the excerpt of record at page 10 that it may be involuntarily extended if Congress declares a war or national emergency. And so it's on that basis that I submit that more general terms in the contract that say that it's subject to laws, whether they're specified or not, and that these changes in the laws may affect the recruit's status or responsibilities or pay or benefits, those are not as directly applicable as the provision in the contract that directly talks about the term of the enlistment. Because when you deal with the expectation of the parties, it was very clearly an expectation that he was enlisting for one year under the try-one moniker. And on page 56 of the record, the district court made a specific finding that, you know, as to the purpose of his and the limit of his enlistment. So it's one thing to say that once you're in the military, they can change the rules and, you know, assign you to something that you weren't expecting to be assigned to, but it's another to say that if you sign up for a specific term, they can keep you for as long as they want. And what they did, in fact, in this case, was they said they could keep him as long as the December 24, 2031. They've argued in the court below that this was just for the convenience of their database on the computer. But the fact remains that if the court doesn't honor the very specific, if the military isn't required to honor the very specific term in the contract about when the enlistment can be involuntarily extended, that people should know that when they sign up for the military, they're in forever, as well as that anything can happen. The military has complete control, not only as to the circumstances of the service, but also the length of the service. So that's the main distinction between this case and Santiago. But, of course, the other issues that we raise in this case were not addressed in Santiago, and I think they're extremely important issues. The one that I think is at the heart of our constitutional democracy is the separation of powers issue, because it's very clear in the Constitution under Article I, Section 8, that the Congress has the right to raise the armies, while the President is the commander-in-chief. And this separation is a very fundamental protection of the liberties of Americans. And if President Truman was not allowed in his capacity as the commander-in-chief to seize the steel mills during the Korean War, then I don't see why President Bush should be allowed to involuntarily extend enlistments indefinitely for purposes of sending National Guard and reservists to active duty in Iraq and Afghanistan. That's a convenient way that lawyers talk, but you don't see the differences between seizing steel mills and the commander-in-chief extending enlistment to us? I mean, the attributes of both are so utterly dissimilar, it just jumps right out at you. The seizing steel mills, Your Honor, is a seizure of property without due process, whereas the other is life and liberty without due process. And, well, of course, there's a difference, but I think, you know, in fact, if in the – in our opening brief, there's a discussion of Taylor v. United States where the – you know, I suppose, the State Department has not said that the United States has no obligation whatsoever to extend a term of enlistment or duty of somebody in the military that can only be done by an act of Congress. Well, there's a very consistent statutory scheme in which absolutely all of the statutory provisions require a congressional declaration of war or national emergency before a serviceman can be involuntarily extended in his enlistment. It's only aberration. Do you just have a chain of logic in your argument? Because it seems to me that's the whole point of 12, whatever it is, 12305A. Well, 12305A, the point, what it says is that the President may suspend laws relating to separation, discharge or retirement in certain circumstances and not based on a congressional declaration of war or national emergency. So that's the only aberration in the statutory scheme. Well, I don't know whether it's an aberration or not, but it's pretty clearly a delegation to the President of the ability to do that. Now, the problem with that delegation is that it vitally affects an individual's liberty and puts that individual potentially in danger of death or serious bodily injury. Well, obviously, you can conscript him, but the point is that, I mean, I thought you were arguing that there was a separation of powers issue here. And I was getting off the track, because I don't see why 12305A doesn't solve that problem. Well, the reason it doesn't solve that problem is because there are no limits. There are no limits under which the President can exercise the power. The limit is 12302 and 12304. And under 12304, the President can do it for any operational mission. Under 12302, the President can involuntarily ---- Well, it has to involve only soldiers who are presently enlisted, who are ordered to active duty while they're still within the term of service, who are ordered to stay on for up to two extra years during a time of national emergency declared pursuant to authority conferred upon the President by Congress in the middle of an ongoing military conflict that's actually authorized by Congress. Now, that's pretty narrow. Well, except that, as the district court interpreted it in this case, the national emergency doesn't have to have any relationship with the purpose for which the serviceman's term of duty is extended. And this is exactly what was underlying Taylor v. United States. I think it's on page ---- around page 20 of our opening brief. The court discussed there, that's the Third Circuit, and they discussed there how the power to involuntarily extend enlistments was being abused during the Vietnam War because they were relying on a national emergency that had been declared during the Korean War. So we have a constitutional separation of powers that protects people. We don't have, as in the European and South American constitutions, a state of siege provision where the executive can declare an emergency and then suspend all the other laws. That's a very exceptional situation. And I think just to show what a protection that separation of powers is, of our fundamental liberties, now, if Congress had to perform its own constitutional duty of conscripting, of drafting servicemen involuntarily in order to occupy Iraq and Afghanistan, then they would have a debate, a public debate for which they would be democratically accountable in which they would determine what the needs were and what the justification was and whether it was worth subjecting individual citizens against their will. Sotomayor, asking us to completely revisit the President's decision to declare a national emergency and delegate its authority to the Secretary of Defense, which is just quintessentially something that court can't do. Except that during Youngstown Sheet and Tube Company, when the President, under his power as Commander-in-Chief, sought, through his Secretary of Commerce, Sawyer, to seize the steel mills, the Supreme Court said no. And if the Supreme Court and this Court aren't in a position to, as guardians of the fundamental liberties that are preserved by the separation of powers, then who's in a position to do it? Well, what is it? I say I – it's the words to me, and it's not coming through what your chain of logic is. Hmm. Okay. Well, I'm sorry, Your Honor. I don't know where I've lost you. And I hear you. I mean, I understand what that concept means. I tried to illustrate. I've suggested that Congress, in fact, did that through 12205a. Well – And you're saying no because the national emergency that the President declared doesn't really cover Iraq? Is that the bottom line? Somehow Congress should have, even though it approved the venture, should have declared a national emergency itself? I mean, is that the reasoning? Well, that's the reasoning under the separation of powers theory, that if Congress declared a national emergency and made the decision that therefore justified conscription, then it would be direct action, and they'd be democratically accountable for it. But by the President doing it by executive fiat, and in this instance by stealth because John Doe enlisted in May 2003. So we already had had the 9-11 and the September 14, 2001 declaration of emergency. I'm just saying you're not on notice of the potential of the problem because he enlisted and react after 9-11, after the Iraq invasion, after Afghanistan started. So what was there not to know? After the Milpers memorandum that basically implemented stop-loss, although, in fact, it did not by its terms suspend any laws. And we have said to the contrary in Santiago. Well, in Santiago, they relied on a different document, which was also a memorandum of November 2002, which the government has sought to introduce in this case, but which we've moved to strike. I thought we said that the stop-loss order suspending the separation of separation laws, which is Milper message 03-040, did the trick. Is that not the same one at issue here? If the Court said that in Santiago, I respectfully submit that it was wrong because one, if one looks at the Milpers. It was bound by it, whether it was right, wrong or indifferent. Well, that's an appropriate issue then for on-bank review. Very well be, but Santiago binds us. But I would just say I've read the Milpers instruction many times, and I find in there no reference to the suspension of any laws. And I think that our argument that under 12-305, that no laws were suspended is absolutely correct. Now, of course, Santiago was decided after we made that argument. It was the – it was amended to include that finding on September 28, which was only a few weeks ago. So – and it was amended on the very same day that the panel denied a rehearing or a rehearing on banks. So there was no possible review of it. But there is a recognition in Santiago that they weren't going to decide the issues in this case and that this case – they noted that this case was pending. Mr. Sherry, thank you. Your time has expired. Thank you very much. I'm Thomas Byron from the Department of Justice here on behalf of the appellees, the government. I want to – I'm happy to answer any questions the Court might have about the merits of this case. We think the merits are clearly laid out in the briefs. Before I get to any merits questions, though, I would like to address the suggestion of mootness that we filed and that my opponent has responded to just a couple of days ago. There was one representation in my opponent's argument that I think needs clarification. He stated that upon completion of medical treatment and physical evaluation, John Doe would be required to be returned to active duty with his unit, and that's not accurate. The orders actually say that he would be returned to his home station, his permanent station. They also say that upon return to his home station, he will be released from active duty. There is – that's a significant difference, after all. His home station is Sacramento, California, and upon release – upon return there, he will be released from active duty. At that time, there's every reason to believe that he'll also be discharged from the service because his enlistment period would have been completed. There's no dispute, I think, at this point that John Doe is not currently serving under any involuntary extension of his enlistment period. He's currently serving under orders that depend on his consent to medical treatment, to active – to be serving on active duty for medical treatment and evaluation. That is essential because his claim – his claim of injury in the petition for mandamus in habeas corpus is that he has involuntarily been extended – his enlistment has been involuntarily extended. You're saying there's no possibility that this extension can continue? I don't know if there's a possibility, but I do know that it's not currently – that there is no current involuntary extension. And I acknowledge they've raised the idea in their response that in the future he could again be subject to the stop-loss policy. First, in the orders that we have now, I don't see any indication that that's true. There's certainly no indication that he would be returned to his unit on active duty, which is what the stop-loss policy would cover. But even if it were true, after all, it wouldn't give him a present injury sufficient to challenge this policy. I think that raises a question, then, of rightness, of whether there's really an imminent threat of the kind of injury that he's complaining about. And therefore, for that reason, I think that there's no case or controversy for this Court to resolve the merits. However, we're not running from the merits. I want to make that perfectly clear. We think the merits here are quite clearly easily resolved in the government's favor. Give it to us in a nutshell. Santiago. That's it? I think that the reasoning and the holding of this Court's decision in Santiago leave no room for the kinds of arguments that the plaintiff here has made. To be sure, the Court said we're not going to address those arguments in Santiago, but the reasoning, the path that the Court took in Santiago in resolving the questions that were presented leave no room for these kinds of arguments. They resolved the question of the plain meaning of Section 12305, which is – and they held that that statute gives the President and by delegated authority the military to execute the stop-loss policy that was at issue there and is equally at issue here. There's no difference in the policy. There's no difference in the statute. There's no difference in the form enlistment contract that's at issue here. The try one argument that my opponent has raised in passing is not a meaningful difference. First of all, this is not a case about any factual representations that might have been made to this individual. If you look at the petition, there is only a passing mention of the name of the try one program. There's no representation of any alleged fraudulent misrepresentation concerning the scope of that program or its effect. Therefore, that does not offer a meaningful basis for distinguishing the Santiago decision. If the Court has no further questions on the merits, I'd be happy to urge affirmance or dismissal as appropriate. I just would like to ask you why in this case the contracts are the same, and I was – I didn't quite understand how the try one issue came up. But I suspect that, as counsel argued it, that his client was lured into the service, that there's a suggestion that the government is a stop from its conduct in this case of enforcing the nonstop. What's your response to that? Well, First Judge Wallace, there's been no argument about a stopple or fraudulent misrepresentation or any other basis that might offer a meaningful ground for avoiding the effect of the contract first and of the statutes that were in place and the implementation of those statutes. This is not an estoppel case. They've never argued estoppel in the record, in the petition or in the hearing below or in the briefs in this case, for that matter. Even if it were an estoppel case, OPM v. Richmond, of course, as the Court knows, emphasizes that an estoppel claim against the government is an enormously difficult burden to carry. And to carry affirmative misconduct, all kinds of requirements that are present. I think that's right. And they haven't even tried to make the argument, let alone carry that burden. This is not an estoppel case. It's not a misrepresentation case. This is a case that raises arguments that are extraordinarily similar to those raised and rejected by this Court in Santiago. I hope that answered your question, Judge Wallace. Thank you. Anything else? Thank you, Your Honor. I take no further questions. Thank you. The counsel on the matter just argued will be submitted, and the Court will stand adjourned for this session.
judges: Wallace, Trott, Rymer